Mark H. Tidman
1226 Washington Drive
Annapolis, MD 21403
202-255-2061
Marktid64@yahoo.com

Attorney pro se



RECEIVED

SEP - 7 2022

AT 8:30_____M
WILLIAM T. WALSH
CLERK

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### CAMDEN DIVISION

Mark H. Tidman
1226 Washington Drive
Annapolis, Maryland 21403

                Plaintiff,

      v.

Eminence Hardscapes & Pool Designs LLC
42 East Holly Avenue
Sewell, New Jersey 08080

Anthony DiMatteo
42 East Holly Avenue
Sewell, New Jersey 08080

Kimberly Monaco
42 East Holly Avenue
Sewell, New Jersey 08080

FS Swimming Pools Inc.
2780 NW 137th Terrace
Gainesville, Florida 32606

Fred Saad
2780 NW 137th Terrace
Gainesville, Florida 32606

Exclusive Pools Inc.
4322 NW 13th Street
Gainesville, Florida 32609

                Defendants.

CIVIL ACTION NO.:



R E C E I V E D

SEP - 7 2022

AT 8:30_____M
WILLIAM T. WALSH
CLERK

## **COMPLAINT**

Plaintiff hereby files this Complaint against Defendants Eminence Hardscapes & Pool Designs LLC ("Eminence"), Anthony DiMatteo ("DiMatteo"), Kimberly Monaco ("Monaco"), FS Swimming Pools Inc. ("FS"), Fred Saad ("Saad") and Exclusive Pools Inc. ("Exclusive") as follows:

## PRELIMINARY STATEMENT

1. This is a civil action to recover damages, including consequential damages and punitive damages, under 18 U.S.C. § 1962, breach of contract, breach of covenant of good faith and fair dealing, fraudulent misrepresentation, fraudulent inducement, unjust enrichment, piercing the corporate veil, violation of the New Jersey Unfair Trade Practices Act, violation of the New Jersey Consumer Fraud Act, vicarious liability, and negligence.

## THE PARTIES

2. Plaintiff is a resident of Maryland residing at 1226 Washington Drive, Annapolis, Maryland 21403. Plaintiff is also the owner of the property located at 309 W. Fourth Street, Lewes, Delaware 19958 (the "Lewes Property").

3. Defendant Eminence Hardscapes LLC & Pool Designs ("Eminence") is located at 42 East Holly Avenue, Sewell, New Jersey 08080.

4. On information and belief, Defendants Anthony DiMatteo ("DiMatteo") and Kimberly Monaco ("Monaco") are married and reside at 42 East Holly Avenue, Sewell, New Jersey 08080, the same address out of which they run their business, Eminence.

5. On information and belief, Defendants DiMatteo and Monaco are the sole owners of Eminence.

6. On information and belief, Defendant FS Swimming Pools Inc. ("FS") is a Florida corporation with a prior business address of 2780 NW 137th Terrace, Gainesville, Florida 32606.

7. On information and belief, Defendant Exclusive Pools Inc. ("Exclusive") is a Florida corporation and successor-in-interest of FS, with common ownership with FS, located and doing business at 4322 NW 13th Street, Gainesville, Florida 32609.

8. On information and belief, Defendant Fred Saad ("Saad") is the owner of FS and Exclusive with a residence at 2780 NW 137th Terrace, Gainesville, Florida 32606.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. §§ 1964 and 1965 (jurisdiction and venue under Racketeering Influenced and Corrupt Organizations Act), and 28 U.S.C. § 1332 (diversity jurisdiction) because there is diversity of citizenship between the parties, as the Plaintiff is a citizen of the State of Maryland, and the Defendants are citizens of the State of New Jersey and Florida, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

10. The venue of this matter is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

11. In the summer of 2021, Plaintiff and his family began contemplating the installation of a pool at their summer home, the Lewes Property.

12. In searching for a fiberglass pool,[1] Plaintiff came across a number of companies that were prominent in conducting online searches, one of which was FS.

---

[1] For context, there are generally three types of pools: vinyl liner pools, "gunite" or concrete pools, and fiberglass pools. A vinyl liner pool has a vinyl liner between the pool water and a pool supporting structure. A gunite pool is essentially a concrete blend sprayed over a steel framed pool. A fiberglass pool—the type contemplated for the Lewes Property—is a prefabricated pool that is brought to the pool site and set into the ground. *See* What is a Gunite Swimming Pool?, Blue Haven Pools (May 16, 2016), https://articles.bluehaven.com/what-is-a-gunite-swimming-pool; What Is The Best Type of Inground Swimming Pool for You?, Latham, https://www.lathampool.com/plan-your-pool/inground-pool/fiberglass-vs-concrete-vs-vinyl-liner-pools/ (accessed Aug. 29, 2022).

13. The prior FS web site is no longer active but was laid out and appeared very much like the Exclusive web site, with a professional appearance and links for requesting more information.  One of those links (the "Contact Link") was for seeking a quote or to be contacted.

14. Plaintiff made a request to be contacted by FS through the Contact Link on FS's website.

15. In response to Plaintiff's request to be contacted, DiMatteo called Plaintiff, informing Plaintiff that DiMatteo was the authorized dealer and distributor for FS in New Jersey and Delaware.

16. FS, via its website, obviously generated the lead, and combined with DiMatteo's indication that he was the relevant authorized FS dealer, DiMatteo, Monaco and Eminence were cloaked in an appearance of legitimacy as authorized agents of FS.

17. On October 13, 2021, Plaintiff and Eminence entered into a contract (the "Initial Contract") for the installation of a pool and accessories therewith, such as a pump, filter system, heater, and other items, at the Lewes Property. The Contract is attached as Exhibit 1.

18. On October 14, 2021, DiMatteo's son, Michael DiMatteo ("Michael"), who was working with Eminence, DiMatteo and Monaco at the time, visited the Lewes Property to meet with Plaintiff and work through the layout of the pool.  The Plan and photo of the layout are attached as Exhibit 2. ("Pool Layout").

19. Following that meeting, the Parties agreed to an amendment to the contract for a slightly larger pool, and also agreed a hardscape and fencing, with a total cost for the pool, fencing, 125,000 BTU Hayward heat pump heater for the pool, stone coping and 1200 square feet of paver decking of $62,675.  The parties did not paper this change in size of the pool, but it is

confirmed by the reserving to the correct model by Eminence with FS and the change in payments made.

20. The red flags arose quickly after ratification of the contract.

    a.   Bonnie Scheel, an employee of Eminence, indicated that she would handle all permitting, and the contract specifies that Eminence "will assist in applying for permits."

    b.   On October 14, 2021, Monaco emailed Plaintiff that "Bonnie just completed the Building Permit."

    c.   However, Plaintiff would come to learn several months later that Eminence had done nothing at all toward permitting.

    d.   Indeed, Plaintiff made numerous trips to Lewes to handle the permitting himself.

21. When Plaintiff complained about the permitting process and lack of handling or assistance by Eminence, DiMatteo made the statement to Plaintiff that virtually no pool installation companies handle permitting.  This statement was false on its face, false as to Eminence's own contract, and was another red flag for Plaintiff.

22. Permitting was complete by March 2022, and Plaintiff handled digging clearances with utilities in April 2022.  These permits were another example of something else that Plaintiff needed to handle with no assistance from Eminence, DiMatteo, or Monaco.

23. The Contract set various payments in a schedule, and there was a separate structure for the pool contract and the hardscape.

24. The first payment from Plaintiff to Eminence was made at on October 13, 2021, in the amount of $7,360.00 as the deposit on the contract.

25. A second payment from Plaintiff to Eminence in the amount of $3,000.00 was made as an increase on the deposit associated with the decision to go with the larger pool, a 24' model called the Classic 27, rather than a 20' model called the Praia 17.

26. The hardscape deposit was made by Plaintiff to Eminence in the amount of $6,625.00 on January 13, 2022.

27. On February 17, 2022, Plaintiff paid Eminence the amount of $12,880.00.

28. On May 12, 2022, Plaintiff paid Eminence the amount of $6,000.00 in accordance with the Contract and at DiMatteo's representation that the pool itself was being picked up.  The total wired by May 12, 2022, thus was $48,745 for the pool and hardscape contracts.

29. Next came the long, tortured saga of inaction by DiMatteo and Eminence and the total disappearance of Monaco.  On May 9, 2022DiMatteo texted Plaintiff that he was "going to start the dig on Wednesday" May 11, 2022.  DiMatteo did not show up nor notify Plaintiff that he would not be showing up.

30. Despite his representations about picking up the pre-fabricated fiberglass pool, when DiMatteo and the crew showed up at the Lewes property for the first time on May 12, 2022, they did not have the pre-fabricated fiberglass pool or any other equipment.

31. A small part of the excavation was conducted on May 12, 2022, and was supposed to continue. However, DiMatteo and the crew disappeared the next day, Friday May13, 2022, at midday.  Plaintiff texted DiMatteo on May 13, 2022, at 1:50 p.m. that "I guess you guys bagged it for today."  No response to that text was forthcoming.

32. DiMatteo repeatedly had promised that the pool would be fully installed by Memorial Day weekend, but weeks passed with no activity and $48,745.00 paid.

33. On May 31, 2022, Plaintiff texted DiMatteo "would you let me know what the planned schedule is from here?"

34. On June 6, Plaintiff texted DiMatteo about an expectation that DiMatteo would be at the Lewes Property, but DiMatteo was not there.

35. On June 7, 2022, Plaintiff texted "I am getting a little concerned about timing. I have a bday weekend June 24 and was hoping we will be complete by then, but that is just 17 days out. Do you think that is doable?" DiMatteo responded that same day "Absolutely 100%." But that was 100% mendacious.

36. Further texts were exchanged based on discussions of expectations that DiMatteo would be at the Lewes Property on June 8 and/or 9, 2022, but DiMatteo did not show up.

37. By mid-June 2022, for the first time, DiMatteo raised the excuse that rain was the problem, and that water in the hole was an issue. Still, numerous dry days and weeks passed without action.

38. On June 16, Plaintiff texted "It looks like we will be dry Friday through Wednesday. Please let me know the plan." DiMatteo offered no plan.

39. On June 26, 2022, as summer slipped away, Plaintiff texted DiMatteo "So Friday, my entire family goes to Lewes for our family vacation, and it is the beginning of July 4 weekend. Tuesday through Friday looks clear and dry. Please do not miss any of those days working full steam ahead."

40. No one from DiMatteo did anything at the Lewes property between June 26-July 3, 2022.

41. On June 29, 2022, expecting DiMatteo to show up at the Lewes Property on June 30, 2022, allegedly to bring the pool itself. Plaintiff texted DiMatteo "I will see you tomorrow."

42. The next day, June 30, 2022, DiMatteo texted Plaintiff "The escorts won't arrive until 1 to lead the pool over the bridge. I also picked up the salt system as well." DiMatteo never showed up on June 30, 2022, apparently because the escort did not show up.

43. The next excuse had to do with the need for a bond wire inspection, which is an inspection of an electrical wire around the pool before it is backfilled. Despite that the inspection requirements were the responsibility of Eminence per the Agreement, Plaintiff went to Lewes City Hall and learned that no bond wire inspection is required and so informed DiMatteo on July 5, 2022.

44. By this point, because DiMatteo had now used water in the hole as the major reason for repeated failures to do anything, Plaintiff had repeatedly asked about the "fix" for that situation.

45. DiMatteo informed Plaintiff that the fix would be to pour a concrete pad in the hole on which to sit the pool.

46. On July 5, 2022, texts went back and forth about the pad, pricing for the pad, and further delay.

    a. Specifically, Plaintiff could pay $5,000 and get the pad poured immediately with another contractor or pay DiMatteo $4,000, and get it done less expeditiously.

    b. DiMatteo strongly indicated that he did not want another contractor on the site, and he promised to move promptly.

    c. DiMatteo did not move promptly.

47. On July 7, 2022, Plaintiff texted DiMatteo "Been dry today. Sun has been in and out. I will put the cars in the road this evening so you can get in tomorrow morning." DiMatteo responded "I'll be there with bells on." DiMatteo showed up at the Lewes Property for the

first time since the one and one-half days in early May with guys on July 8, 2022,collected a

check for $4,000 to cover the concrete, indicated he was going out to get supplies, and then

disappeared with no word and no concrete.

48. As of this filing, that was the last time DiMatteo or anyone from Eminence has gone to the

Lewes Property. That $4,000.00 payment brought the total paid from Plaintiff to Eminence to

$52,745.00.  Copies of the wires and single check are attached as Exhibit 3.

49. Obviously, Plaintiff was very concerned, frustrated and stressed that he had paid $52,745

with essentially nothing to show for it after ten months. On July 13, 2022, Plaintiff texted

DiMatteo "you keep missing windows.  I begged you to stick to plan Monday.  There is

plenty of work to do . . . . I am at my wits end."  Plaintiff further advised DiMatteo that

Plaintiff would move the ball forward by pouring the concrete pad with his other contractor

for $5,000 and deduct the $4,000 previously paid to DiMatteo from the final

payment.  DiMatteo accepted that and via text on July 13, 2022, responded, "if that's what

you want to do fine."

50. By this point, the pool hole was bone dry, and photos of the dry hole were sent to DiMatteo

on July 14, 2022.  However, now Monaco had allegedly contracted COVID-19 and DiMatteo

represented that he was afraid she would not recover.  Plaintiff does not know the veracity of

these statements, though Michael DiMatteo informs that DiMatteo and Monaco use false

medical conditions to manipulate their cons and court.  Whatever the case, Monaco

apparently recovered based on representations by DiMatteo.

51. On July 15, 2022, Plaintiff had the concrete pad poured and paid the other contractor $5,000.

52. On that same day, July 15, Plaintiff sent photos of the pad to DiMatteo, and asked various

questions about the size of the hole. DiMatteo engaged on small details concerning the pad

size, thickness, etc., but remained noncommittal on timing for the subsequent installation of the pool.

53. On July 28, 2022, DiMatteo texted that Monaco was "doing better. And also, I have my son scheduled you in I'll you over the weekend." However, DiMatteo's son, i.e., Michael DiMatteo had ceased associating himself with DiMatteo by this time. Michael DiMatteo explained to Plaintiff that Michael DeMatteo himself had been conned and saw the con scheme DiMatteo and Monaco were conducting.

54. DiMatteo did not contact Plaintiff over the weekend.

55. On July 31, 2022, Sunday night at 10:06 p.m., Plaintiff texted DiMatteo "checking in. Please update me when you can." DiMatteo did not respond.

56. On Wednesday, August 3, 2022, Plaintiff texted DiMatteo "No word over the weekend. Now Wednesday and fall is around the corner. Please advise." DiMatteo did not respond.

57. On Thursday, August 4, 2022, Plaintiff texted DiMatteo "please call me back."

58. Plaintiff sent that text because DiMatteo had not just been ignoring texts, but also calls throughout this period. DiMatteo finally responded "I'm in the middle of something I'll talk to you soon." Since DiMatteo sent his "talk to you soon text," DeMatteo has not talked to Plaintiff as of the filing of this Complaint.

59. On Sunday, August 7, 2022, Plaintiff texted DiMatteo "Can you get to my job this week? I feel like I took the rain issue away by spending the extra $5k, and seems like I should be the top priority to complete now. Please advise. " DiMatteo responded that he had the Lewes Property job scheduled for Thursday and Friday, August 11 and 12, 2022. DiMatteo did not

show up on August 11 or 12, 2022, nor did DiMatteo ever communicate that he was unable to get there or any reason for the failure to show.

60. On August 12, 2022, Plaintiff texted DiMatteo asking about progress. DiMatteo did not respond.

61. On August 14, 2022, Plaintiff's calls, and a text to DiMatteo to "call me" went ignored and unanswered. On August 14, 2022, at 4:36 p.m., DiMatteo texted Plaintiff "I sent you an email earlier." DiMatteo's email had gone to Plaintiff's junk mail and that email simply provided in full: "It rained."

62. However, although it had rained, it was a light rain. Given the light rain and the poured concrete pad, the light rain did not impact DiMatteo's ability to work on installing the pool.

63. On TI DATE, Plaintiff texted DiMatteo, referring to August 16-19, 2022, that "Tuesday, Wednesday, Thursday, and Friday look cool and dry. So can you commit to being there or not?" DiMatteo responded "Thursday and Friday look great."

64. On August 17, 2022, Plaintiff texted DiMatteo in the morning: "Please confirm you are coming tomorrow." DiMatteo did not respond to the text. That afternoon, Plaintiff texted DiMatteo: "Are you coming tomorrow," DiMatteo responded: "I'm at a funeral right now man I'll call u later." DiMatteo did not call later and did not show Thursday or Friday.

65. Despite the repeated promises and obligations outlined above, DiMatteo came to the Lewes Property a total of two full days. First on May 12, 2022, to dig a hole that would be left with piles of dirt and no grading, and on July 7,2022, to collect another payment.

66. On information and belief, DiMatteo and Monaco have a long history of fraudulent and criminal conduct. See Exhibit 3. Both were implicated in consumer fraud claims and have had numerous complaints against them.

67. On information and belief, this summer alone, summer of 2022, DiMatteo and Monaco have utilized their Eminence enterprise to defraud numerous other customers, as well. In this regard, Defendant Saad, and DiMatteo's own son Michael DiMatteo, have received a number of calls from such customers trying to get the work completed and to ask about DiMatteo and Monaco. Michael's response, at least to Plaintiff, is that Tony and Kim are life-long con artists.

68. Despite that Plaintiff has paid $52,745 to Eminence, virtually no work has been done, virtually no components have been delivered, and Plaintiff's cherished Lewes Property is left in ruins. See Exhibit 5, comprised of photos of the site taken on August 26, 2022.

69. On information and belief, none of the sums paid to Eminence were used to purchase or deliver any of the components of the pool project for the Lewes Property, and the funds instead were used by DiMatteo and Monaco for another, unauthorized and fraudulent purpose.

70. Through discussions with Defendant Saad, Saad's son, DiMatteo's son, and investigation of sources online, Plaintiff learned that DiMatteo had spent over a decade in prison and is a professional con artist. In fact, DiMatteo and Monaco jointly have been conning people out of their money for many years, with numerous cases, press and scammed and harmed customers left in their wake. Indeed, DiMatteo scammed his own son, Michael, who no longer associates with DiMatteo or Monaco. These many years of running fraudulent pool and hardscape companies and scamming people out of their money[constitutes a clear pattern of racketeering.

71. On information and belief, despite that the information around the criminal and fraudulent behavior of DiMatteo and Monaco is readily available, FS, Saad and Exclusive never

conducted any due diligence of DiMatteo, Monaco, and/or Eminence prior to making Eminence an authorized dealer for FS and directing customers to DiMatteo, Monaco and Eminence.

72. As a result of the gross negligence of FS, Saad and Exclusive to make any reasonable diligence prior to appointing Eminence as FS' authorized dealer, and through its web site lead generation, FS effectively led customers to slaughter, cloaking a life-long con artist in legitimacy, leading a life-long con artist to unsuspecting customers, and enabling a life-long con artist to scam innocent and hard-working people out of tens of thousands of dollars.

73. The status of the Lewes Property pool project is a dirt hole with a concrete pad in the bottom, a torn up, muddy yard, a torn up gravel driveway, fence, and landscape lights all in need of repair. The estimated cost of repair for the driveway, including removal of a portion of gravel, re-laying of the weed barrier, and replacement and addition of more gravel, as well as the replacement of a "railroad tie" gravel barrier that was removed and allowed to warp, is as yet unknown, but estimates will be obtained and submitted into evidence.

74. Plaintiff is also informed by Michael DiMatteo and other contractors that the concrete pad is inappropriate for a fiberglass pool. As such, not only is there the consequential and actual damage of $5,000 spent on the concrete pad in the hole, but the pad will now need to be removed, or perhaps adjusted to accommodate a new pool. The completion of that process and estimates for the installation of a pool and completion of the project are not yet known, will be obtained, and will be submitted into evidence. At minimum, Defendants are liable for the $5,000.00 spent on the pad in addition to the $52,745 spent to date in actual and consequential damages.

## CAUSES OF ACTION

### COUNT ONE
### (Violation of 18 U.S.C. § 1962(d))

75.  All preceding paragraphs are incorporated as though fully stated herein.

76. Section 1962, Title 18 of the U.S. Code makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)" of 18 U.S.C. § 1962.  *See* 18 U.S.C. § 1962(d).

77.  Subsections (a), (b), and (c), of 18 U.S.C. § 1962 provide:

(a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b)  It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*See* 18 U.S.C. § 1962(a)–(c).

78. Defendants Eminence, DiMatteo and Monaco are participants in an enterprise that operates with the purpose of deceiving legitimate individuals and companies into agreements under which participants in the enterprise contract for pool and hardscape installations, and require electronic wiring of substantial funds. The participants, however, have no intention at the time of contracting of obtaining the pool, hardscape, or other items, nor of installing the pool, hardscape, or other items, rather simply seeking to unlawfully use the enterprise to coerce the payment of fees from unsuspecting customers.

79. Pursuant to and in furtherance of their fraudulent scheme, Defendants Eminence, DiMatteo and Monaco committed acts of racketeering in violation of state and federal law, including 18 U.S.C. § 1961 *et seq.*, including wire fraud in violation of 18 U.S.C. § 1341.

80. Defendants and co-conspirators DiMatteo and Monaco knowingly and willfully participated in the Eminence enterprise scheme with specific intent to defraud Plaintiff and the other victims. In furtherance of the scheme, Defendants DiMatteo and Monaco repeatedly used and knowingly caused to be used interstate wire communications (including wire transfers of money, email communications, text messaging, and telephone communications) to effectuate the purpose of defrauding Plaintiff Capital and others.

81. Defendants Eminence, DiMatteo and Monaco used and caused to be used interstate wire communications to obtain possession of the substantial fees, to transmit the fees (upon information and belief) to themselves for personal use, and to perpetuate the unlawful conduct of the Eminence enterprise by communicating with Plaintiff and other victims of the Eminence enterprise through email, text messaging, and telephone calls.

82. Defendants DiMatteo and Monaco, upon information and belief, operate in their individual capacities and through various entities, such as Eminence, established, entirely or in part, to carry out unlawful acts of fraud.

83. Plaintiff fell prey to the racketeering activity of Defendants Eminence, DiMatteo and Monaco and is also aware of others who have been victimized Defendants Eminence, DiMatteo and Monaco.

84. The racketeering acts described above constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5), and such acts and conduct of the Eminence enterprise through the pattern of racketeering activity described were for the unlawful purpose of intentionally defrauding Plaintiff and others in violation of 18 U.S.C. § 1962(c).

85. Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).  Defendants respectively agreed to facilitate the operation of the SBLC Enterprise through a pattern of racketeering activity, and knowingly agreed to facilitate the SBLC Enterprise's scheme by committing racketeering acts themselves, facilitating the commission of racketeering acts by other participants in the SBLC Enterprise, and ratifying the commission of such racketeering acts by other participants.

86. Defendants DiMatteo and Monaco intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew their racketeering acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the Eminence enterprise scheme. Such conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c) and, in turn, violates 18 U.S.C. § 1962(d).

87. As a direct and proximate result of the conspiracy of Defendants DiMatteo and Monaco, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to an award of damages, costs, and interest in an amount of not less than $57,745.00.

88. In addition, Plaintiff is entitled to recover treble damages plus costs and attorneys' fees under 18 U.S.C. § 1964(c).

89. As direct and proximate result of the acts of racketeering of Defendants Eminence, DiMatteo and Monaco, Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to an award of damages, costs, and interest in an amount of not less than $57,745.00.

## COUNT TWO
### (Breach of Contract)

90. All preceding paragraphs are incorporated as though fully stated herein.

91. At all times relevant to this matter, a contract existed between Plaintiff and Eminence comprised of the Contract and the Agreement.

92. The Contract and Agreement placed obligations and requirements on Eminence.  DiMatteo and Monaco are the sole owners of Eminence and are not shielded from the Agreement by virtue of setting up a corporate entity for the purposes of engaging in fraud.

93. Virtually none of the obligations and requirements imposed by the contract on DiMatteo, Monaco and Eminence were met.

94. By virtue of the facts alleged herein, Defendants Eminence, DiMatteo and Monaco have, with intent to defraud, breached the Agreement.

95. As direct and proximate result of eminence's breach, Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to an award of damages, costs, and interest in an amount of not less than $57,745.00.

## COUNT THREE
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

96. All preceding paragraphs are incorporated as though fully state herein.

97. The Agreement is a contractual agreement which contains an implied covenant of good faith and fair dealing.

98. The implied covenant of good faith and fair dealing requires Eminence, DiMatteo and Monaco to deal honestly and in good faith with Plaintiff.

99. Eminence, DiMatteo and Monaco breached the implied covenant of good faith and air dealing.

100.    As a direct and proximate result of the fraudulent and wrongful conduct of Eminence, DiMatteo and Monaco, Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to an award of damages in an amount of not less than $57,745.00, costs, interest, punitive damages, treble damages at least in the amount of $173,235.00 and attorneys' fees.

## COUNT FOUR
### (Fraudulent Inducement)

101.    All preceding paragraphs are incorporated as though fully stated herein.

102.    As stated above, Defendants Eminence, DiMatteo and Monaco individually and collectively made misrepresentations of material fact to Plaintiff.

103.    Defendants Eminence, DiMatteo and Monaco individually and collectively made these misrepresentations of material fact with the intention of inducing Plaintiff's reliance on them.

104.    Plaintiff reasonably relied on the individual and collective misrepresentation of these material facts by Defendants Eminence, DiMatteo and Monaco.

105.   Plaintiff's reliance on these misrepresentations of material fact by Defendants Eminence, DiMatteo and Monaco caused injury to Plaintiff.

106.   By virtue of the relationship clearly set forth herein, Eminence, DiMatteo and Monaco are alter egos and therefore jointly and severally liable for the misrepresentations made on behalf of their alter ego.

107.   The conduct of Eminence, DiMatteo and Monaco is egregious in nature and was directed at Plaintiff.

108.   As a direct and proximate result of the fraudulent and wrongful conduct of Defendants Eminence, DiMatteo and Monaco, Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to an award of damages in an amount of not less than $57,745.00, costs, interest, punitive damages, treble damages at least in the amount of $173,235.00 and attorneys' fees.

## COUNT FIVE
## (Fraudulent Misrepresentation)

109.   All preceding paragraphs are incorporated as though fully stated herein.

110.   Defendants Eminence, DiMatteo and Monaco made false misrepresentations of fact to Plaintiff.

111.   Defendants Eminence, DiMatteo and Monaco knew or should have known that the representations were false.

112.   Defendants Eminence, DiMatteo and Monaco made the representations to induce action by Plaintiff to enter into the Agreement.

113.   In reliance of the fraudulent representations of Eminence, DiMatteo and Monaco, Plaintiff acted to its detriment.

114.    As a direct and proximate result of the fraudulent and wrongful conduct by Eminence,

DiMatteo and Monaco, Plaintiff has suffered, and continues to suffer, substantial damages

and is entitled to an award of damages in an amount of not less than $57,745.00, costs,

interest, punitive damages, treble damages at least in the amount of $173,235.00 and

attorneys' fees.

## COUNT SIX
### (Unjust Enrichment)

115.    All preceding paragraphs are incorporated as though fully stated herein.

116.    Plaintiff made payments in excess of $52,745.00 to Defendants Eminence, DiMatteo and

Monaco.

117.    Defendants Eminence DiMatteo and Monaco accepted and retained Plaintiff's payments.

118.    Defendant Eminence, DiMatteo and Monaco have been unjustly enriched at the expense

of Plaintiff in an amount of not less than $52,745.00.

119.    Equity and good conscience require restitution and payment in full of all money paid to

them.

## COUNT SEVEN
### (Piercing the Corporate Veil)

120.    All preceding paragraphs are incorporated as though fully stated herein.

121.    Defendants DiMatteo and Monaco are jointly and severally liable for the damages

wrought by Eminence.

122.    Upon information and belief, Defendants DiMatteo and Monaco are the sole owners of

Eminence and conducted all day-to-day activity of the business of Eminence.  Indeed,

Defendants DiMatteo and Monaco considered the Agreement to be directly with them as the

personal agents of FS.

123.    DiMatteo and Monaco do not adhere to corporate formalities. Upon information and

belief, DiMatteo and Monaco have not executed a written limited liability company

agreement with Eminence.

124.    Upon information and belief, Eminence is grossly undercapitalized, and upon receipt of

any payment from Plaintiff, Defendants DiMatteo and Monaco would distribute Eminence's

cash assets to themselves for personal use.

125.    Upon information and belief, Defendants DiMatteo and Monaco used Eminence for the

purpose of committing the above-mentioned fraud on Plaintiff.

126.    Upon information and belief, Defendants DiMatteo and Monaco comingle their assets

with the assets of Eminence (and their other fraudulent corporate vehicles), and the use

Eminence assets to fund their  personal expenses.

127.    At all times relevant to this action, Defendants DiMatteo and Monaco had complete

domination and control over Eminence, and this control was used by Defendants DiMatteo

and Monaco to commit the fraud against Plaintiff and such fraud caused injury to Plaintiff.

128.    As a direct and proximate result of the fraudulent and wrongful conduct of DiMatteo and

Monaco, Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to

an award of damages in an amount of not less than $57,745.00, costs, interest, punitive

damages, treble damages at least in an amount of $173,235.00 and attorneys' fees

**COUNT EIGHT**
**(Violation of New Jersey Unfair Trade Practices Act)**

129.    All preceding paragraphs are incorporated as though fully stated herein.

130.    Defendants Eminence, DiMatteo and Monaco violated New Jersey's Unfair Trade

Practices Act by engaging in unconscionable commercial practices, deception, fraud, false

pretenses, false promise, misrepresentation, or the concealment, suppression or omission of

any material facts with the intent that other rely thereon, in each instance offending the established public policy and acts that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and Plaintiff.

131.   Defendants Eminence, DiMatteo, and Monaco abandoned their contractual obligations to Plaintiff, misled Plaintiff, made intentional and fraudulent misrepresentations to Plaintiff, and unjustly enriched themselves to the detriment of Plaintiff.

132.   Plaintiff has suffered an adverse effect as a result of unfair trade practices by Defendants Eminence, DiMatteo and Monaco as alleged herein.

133.   As a direct and proximate result of the fraudulent and wrongful conduct of Defendants Eminence, DiMatteo and Monaco, Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to an award of damages in an amount of not less than $57,745.00, costs, interest, punitive damages, treble damages at least in an amount of $173,235.00 and attorneys' fees.

## COUNT NINE
### (Violation of New Jersey Consumer Fraud Act)

134.   All preceding paragraphs are incorporated as though fully stated herein.

135.   Defendants Eminence, DiMatteo and Monaco violated New Jersey's Consumer Fraud Act by engaging in unconscionable commercial practices, deception, fraud, false pretenses, false promise, misrepresentation, or the concealment, suppression or omission of any material facts with the intent that other rely thereon, in each instance offending the established public policy and acts that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and Plaintiff.

136.    Defendants Eminence, DiMatteo, and Monaco abandoned their contractual obligations to Plaintiff, misled Plaintiff, made intentional and fraudulent misrepresentations to Plaintiff, and unjustly enriched themselves to the detriment of Plaintiff.

137.    Plaintiff has suffered an adverse effect as a result of unfair trade practices by Defendants Eminence, DiMatteo and Monaco as alleged herein.

138.    As a direct and proximate result of the fraudulent and wrongful conduct of Defendants Eminence, DiMatteo and Monaco, Plaintiff has suffered, and continues to suffer, substantial damages and is entitled to an award of damages in an amount of not less than $57,745.00, costs, interest, punitive damages, treble damages at least in an amount of $173,235.00 and attorneys' fees.

## COUNT TEN
### (Vicarious Liability)

139.    All preceding paragraphs are incorporated as though fully stated herein.

140.    The acts of fraud and deceit by Defendants Eminence, DiMatteo and Monaco were conducted cloaked with the legitimacy of being authorized representatives and agents of FS, Exclusive and Saad.

141.    Defendants FS, Exclusive and Saad knew or should have known that Eminence, DiMatteo and Monaco had a history of consumer fraud.  Indeed, ANY level of due diligence via even a simple online search engine review would have uncovered information about the history of Eminence, DiMatteo and Monaco.

142.    Further, Defendants FS, Exclusive and Saad knew throughout the spring and summer of 2022 that Eminence, DiMatteo and Monaco had reserved the pool at issue, the Classic 27, and never paid or requested shipping of the pool.

143.   On information and belief, Defendants FS, Exclusive and Saad also had received calls

from at least one other defrauded consumer early in the summer of 2022 and sought to

terminate the authorized agency relationship they had with Defendants Eminence, DiMatteo,

and Monaco but failed to notify Plaintiff, who remained in the dark making payments to

frauds served up and brought to Plaintiff's door by Defendants DS, Exclusive and Saad.

144.   As a result of the acts and omissions of Defendants FS, Exclusive and Saad, Defendants

FS, Exclusive and Saad are vicariously liable for the wrongful and fraudulent acts of

Defendants Eminence, DiMatteo and Monaco asserted in this Complaint, including all actual

and consequential damages, punitive damages and attorneys' fees.

## COUNT ELEVEN
### (Negligence)

145.   All preceding paragraphs are incorporated as though fully stated herein.

146.   Defendants FS, Exclusive and Saad owed a duty of care to its customers in appointing its

authorized dealers and agents and in the conduct of its business and in referring its customers

to those authorized dealers and agents.

147.   On information and belief, Defendants FS, Exclusive and Saad conducted no due

diligence on Eminence, DiMatteo and Monaco, or were willfully indifferent to the legitimacy

of Eminence, DiMatteo and Monaco and/or their history of fraudulent behavior.

148.   The failure to conduct any diligence in the appointment of Eminence, DiMatteo and

Monaco, and/or the gross indifference to their history of fraudulent behavior, combined with

the active referral of Eminence, DiMatteo and Monaco to unsuspecting customers, including

Plaintiff, constitutes a breach of the duty of care and gross negligence by Defendants FS,

Exclusive and Saad.

149.    Such breach of duty of care and gross negligence by Defendants FS, Exclusive and Saad

were the direct and proximate cause of the Plaintiff's damages as claimed herein.

150.    As a direct and proximate result of the breach of duty of care and gross negligence of

Defendants FS, Exclusive and Saad, Plaintiff has suffered, and continues to suffer,

substantial damages and is entitled to an award of damages in an amount of not less than

$57,745.00, costs, interest, as well as treble damages in an amount of $173,235.00 and

attorneys' fees.


WHEREFORE, Plaintiff prays for judgment against Defendants on all counts herein and

award actual damages in the amount of not less than $57,745.00; award punitive damages in an

amount of $173,235.00; award of Plaintiff's attorneys' fees and costs; and any other relief the

Court deems just and proper.



Dated: September 6,  2022

Mark H. Tidman

1226 Washington Drive
Annapolis, MD 21403
202-255-2061
Marktid64@yahoo.com

Attorney pro se