NOT FOR PUBLICATION                                    [Docket No. 14]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

MARK H. TIDMAN,

           Plaintiff,

    v.

EMINENCE HARDSCAPES, LLC, *et al.*,

           Defendants.

Civil No. 22-5441 (RMB-AMD)

**OPINION**

**RENÉE MARIE BUMB, Chief United States District Judge**:

This matter comes before the Court upon the filing of a Motion for Default Judgment by *pro se* Plaintiff Mark H. Tidman ("**Plaintiff**") pursuant to Federal Rule of Civil Procedure 55(b)(2). [Docket No. 14.] Plaintiff seeks a judgment of default as to Defendants Eminence Hardscapes, LLC ("**Eminence**"), Anthony DiMatteo ("**DiMatteo**"), FS Swimming Pools, Inc. ("**FS**"), Exclusive Pools, Inc. ("**Exclusive**"), and Fred Saad ("**Saad**") (collectively, "**Defendants**"). For the reasons that follow, Plaintiff's Motion will be **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On September 7, 2022, Plaintiff commenced the above-captioned action against Defendants, asserting various state law claims sounding in contract and tort and claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1962, 1964), the New Jersey Consumer Fraud Act (NJCFA) (N.J.S.A. § 56:8-1, *et seq.*),

and the New Jersey Unfair Trade Practices Act (NJUTPA) (N.J.S.A. § 56:8-2). [Compl., Docket No. 1.] On September 29, 2022, Plaintiff filed an Amended Complaint, reasserting the foregoing claims against Defendants and setting forth additional factual allegations. [Docket No. 5-1 ("**Am. Compl**.").]

In brief, Plaintiff, who sought the services of a contractor in the summer of 2021 to install a pool at his family's summer home in Delaware, contends that he was defrauded by Eminence and DiMatteo into paying thousands of dollars for a pool that they never installed. [*Id.* ¶¶ 2, 24, 35–88.] After inducing Plaintiff to enter into a contract dated October 12, 2021 purporting to provide for the installation of the pool by Memorial Day 2022, and despite extracting installments of money from Plaintiff over the next several months, Eminence and DiMatteo failed to make any material progress by the end of summer 2022 and eventually disappeared altogether, leaving Plaintiff's property in disarray. [*Id.* ¶¶ 32–88.] Plaintiff believes that Eminence and DiMatteo never intended to perform under their agreement. [*See id.* ¶ 92.] Plaintiff further alleges that FS, Exclusive, and Saad were negligent in appointing Eminence and DiMatteo as authorized representatives of their pool-selling enterprise. [*Id.* ¶¶ 97–102.] Plaintiff seeks repayment from Defendants of the costs he expended under his contract with Eminence and DiMatteo, and he seeks treble damages as well. [*See id.* ¶¶ 117, 123, 128, 136, 142, 156, 161, 166, 178.]

Plaintiff first encountered Eminence after requesting a quote for a swimming pool on the website of FS (i.e., www.fiberswimmingpools.com), which prompted

DiMatteo and Kimberly Monaco[1] to call Plaintiff and present Eminence as an authorized dealer of FS in New Jersey and Delaware. [Am. Compl. ¶¶ 25–29.] On October 12, 2021, Plaintiff contracted with Eminence for the installation of a pool at his property in Delaware. [*Id.* ¶ 32; Am. Compl., Ex. 1 (Initial Contract), Docket No. 5-2.] The next day, DiMatteo's son, Michael Lippi ("**Lippi**"), visited Plaintiff at his Delaware property to prepare the layout of the pool. [Am. Compl. ¶ 33.] After Lippi's visit, the parties agreed to amend their initial contract to increase the size of the pool, add certain accessories, and modify the total cost of the installation project (which was to be $62,675). [*Id.* ¶ 34.]

Plaintiff alleges that, as soon as the parties entered into the amended contract, red flags quickly materialized.  For instance, Eminence failed to handle permitting for the project, as agreed under the contract, which Plaintiff ultimately had to handle by himself. [*Id.* ¶¶ 35–37.] Additionally, Plaintiff alleges that between October 2021 and May 2022, Plaintiff wired installment payments to Eminence pursuant to their contract, which totaled $48,745. [*Id.* ¶¶ 38–44.] Despite multiple promises from DiMatteo that he would report to work on certain days, DiMatteo never did more than

---

[1] Monaco was initially named as a defendant in this action. [*See generally* Compl.; Am. Compl.]  As the only defendant to submit an appearance, she filed an Answer disputing Plaintiff's claims and raising affirmative defenses, and she asserted Crossclaims for contribution and indemnification against Defendants.  [Docket No. 11.] She and Plaintiff entered into a settlement agreement, and on December 23, 2022, they filed a Joint Stipulation dismissing Monaco as a defendant.  [Docket No. 19.] She was terminated from this action thereafter.  Though Plaintiff repeatedly refers to Monaco when referencing Eminence and DiMatteo in the Amended Complaint, because Monaco is no longer a defendant in this action, the Court refers to her only where strictly necessary.

dig a hole at Plaintiff's home on May 13, 2022. [*Id.* ¶¶ 45–47.] During this time period, he repeatedly declined to respond to Plaintiff's inquires via text and phone call as to the status of the pool installation. [*Id.* ¶¶ 49–79.]

Plaintiff alleges that, after DiMatteo dug the initial hole, poor weather conditions (rain) prevented progress on the installation, and the hole soon filled with water. [*Id.* ¶¶ 53, 54, 59.] DiMatteo allegedly informed Plaintiff that the fix to the water problem would be to pour a concrete pad in the hole, which either DiMatteo or a third-party contractor could do. [*Id.* ¶ 61.] Plaintiff elected to have DiMatteo pour the pad. Plaintiff alleges that, on July 7, after visiting the Delaware property to obtain a $4,000 check from Plaintiff to pay for the concrete, DiMatteo disappeared, never to return with the concrete. [*Id.* ¶ 62.]

Plaintiff notified DiMatteo by text on July 13, 2022 that he would have a third-party contractor pour the pad and deduct the $4,000 from the total payment due to DiMatteo, a plan to which DiMatteo assented. [*Id.* ¶ 64.] Plaintiff ultimately paid $5,000 for a third-party contractor to pour the concrete slab. [*Id*. ¶ 66.] Plaintiff alleges that this slab was later found to be an inappropriate fix to the water problem and will now need to be removed. [*Id.* ¶ 88.] In total, DiMatteo visited Plaintiff's home twice: once to dig the initial hole on May 13, 2022; and once to collect a payment on July 7, 2022. [*Id.* ¶ 79.] Plaintiff has paid a total of $52,745 to Eminence and DiMatteo and an additional $5,000 to the third-party contractor. [*Id.* ¶¶ 82, 88.] Plaintiff has not heard from DiMatteo since August 17, 2022—the last time Plaintiff texted DiMatteo

to ask, "Are you coming tomorrow[?]" (DiMatteo responded: "I'm at a funeral right now man I'll call u later."). [*Id.* ¶ 78.] As described, Plaintiff alleges that Eminence, DiMatteo, and Monaco are experienced cons with a history of conspiring together to defraud consumers. [*See id.* ¶¶ 90–96.] He has set forth detailed factual allegations concerning their use of telecommunications to perpetrate their frauds—on Plaintiff and others. [*Id.*; *see id.* ¶¶ 11–22.]

Additionally, Plaintiff asserts that FS, Exclusive, and Saad failed to conduct any due diligence of Eminence and DiMatteo and negligently represented Eminence as Exclusive's "authorized dealer" for New Jersey and Delaware. [*Id.* ¶¶ 98–102.] FS, which is owned by Saad, apparently solicits applications online for prospective contractors to become an FS / Exclusive "authorized dealer." [*Id.*] Plaintiff alleges that FS, Exclusive, and Saad failed to exercise reasonable care, such as by conducting a background check on DiMatteo, in connection with his dealer application. [*Id.*] He further alleges that Saad was aware that Plaintiff had ordered an FS pool but that it was never paid for by DiMatteo, Monaco, or Eminence or shipped to their address. [*Id.* ¶ 102.] Despite having such personal knowledge that DiMatteo, Monaco, and Eminence were defrauding consumers (including another family who had an experience similar to Plaintiff's), he never warned Plaintiff. [*Id.*] Plaintiff contends that FS, Exclusive, and Saad are liable in negligence and are vicariously liable for the actions of DiMatteo, Monaco, and Eminence. [*Id.* ¶¶ 168–172.]

5

After commencing this action, Plaintiff served the Complaint on each of the Defendants by September 20, 2022.  [See Affs. of Serv., Docket No. 3.]  Plaintiff certifies that he served the Amended Complaint on each of the Defendants as well. [Am. Compl. 48 (Certificate of Service).]  None of the Defendants has since entered an appearance or otherwise responded. [*See generally* Docket.]  On October 19, 2022, Plaintiff requested an entry of default, which the clerk subsequently entered. [Docket No. 9.] Plaintiff filed the instant Motion for Default Judgment on October 27, 2022. [Mot. Default J., Docket No. 14.]  He certifies that the Motion was served on Defendants on October 26, 2022.  [Decl. of Mark H. Tidman 3, Docket No. 14.]

Plaintiff requests that default judgment be entered against Defendants, jointly and severally, in the amount of $173,235.00, which represents threefold the amount Plaintiff expended pursuant to his purported contract with Eminence and DiMatteo. [Mot. Default J. 2.]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) allows a court, upon motion by a plaintiff, to enter default judgment against a defendant that has failed to plead or otherwise defend a claim for affirmative relief. Although the presence of certain factors lends a court discretion to enter default judgment, there is a firmly established preference that disputes be decided on the merits whenever practicable. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180–81 (3d Cir. 1984).

Five factors must be considered by a court when deciding whether to grant a default judgment: (1) whether it has subject matter jurisdiction over the claims at issue

and personal jurisdiction over the defendant, (2) whether the defendant is exempt from entry of default judgment, (3) whether there is sufficient proof of service, (4) whether a sufficient cause of action has been stated, and (5) whether default judgment is otherwise proper. *Laborers Int'l Union of N. Am. Local No. 199 v. RAMCO Solutions*, 2013 WL 4517935, at *2–*3 (D.N.J. Aug. 26, 2013) ("**LIUNA**"); *Trustees of N.J. B.A.C. Health Fund v. Thurston F. Rhodes, Inc.*, 2017 WL 3420912, at *2 (D.N.J. Aug. 9, 2017) (internal citation omitted). The propriety of default judgment depends on (1) whether the plaintiff will be prejudiced if default is not granted, (2) whether the defendant has a meritorious defense, and (3) whether the defendant's delay is the result of culpable misconduct. *Butler v. Penn. Bd. of Prob. & Parole*, 613 F. App'x 119, 122 (3d Cir. 2015) (quoting *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000)).

## III. ANALYSIS

### A. The Court's Jurisdiction

The Court considers first its subject matter jurisdiction over Plaintiff's claims and its personal jurisdiction over Defendants. "Verifying the Court's jurisdiction is of particular concern where, as here, the defaulting party has failed to make any sort of appearance or submit any responsive communication to the Court." *Liuna*, 2013 WL 4517935, at *2. In the Amended Complaint, Plaintiff alleges that Defendants' conduct violates RICO, a federal statute. [Am. Compl. ¶¶ 104–117.] For the reasons set forth below, Plaintiff's claim is adequately pled, so this Court exercises federal question subject matter jurisdiction over Plaintiff's RICO claim and supplemental jurisdiction

over Plaintiff's other claims. *See* 28 U.S.C. §§ 1331, 1367; *see also* 18 U.S.C. §§ 1964, 1965.

Additionally, Plaintiff alleges that this Court has diversity jurisdiction because the parties have diversity of citizenship and the amount in controversy exceeds $75,000. [Am. Compl. ¶ 9.] The Court recognizes that Plaintiff is a citizen of Maryland and Defendants Eminence and DiMatteo are citizens of New Jersey and Defendants FS, Exclusive, and Saad are citizens of Florida. [*Id.* ¶¶ 2–8.] Further, the amount in controversy claimed by Plaintiff exceeds $75,000 because his actual damages are $57,745 and he seeks treble damages pursuant to the NJUTPA, NJCFA, and RICO. [*See, e.g.*, *id.* ¶ 178.] The Third Circuit has found that a good faith pleading of the amount in controversy vests a court with diversity jurisdiction, which the court retains even if the plaintiff ultimately cannot prove each count in the complaint or recovers less than the amount in controversy. *Suber v. Chrysler Corp.*, 104 F.3d 578, 583 (3d Cir. 1997). Further, the court must not consider in its diversity jurisdiction inquiry "the legal sufficiency of those claims or whether the legal theory advanced by the plaintiffs is probably unsound." In *Suber*, the Third Circuit acknowledged that the amount in controversy would be calculated after the application of treble damages pursuant to the relevant statute, which happened to be the NJCFA. *Id.* at 587. Assuming RICO did not endow this Court with subject matter jurisdiction to adjudicate this action, only a legal certainty that Plaintiff could not recover under either of the NJUTPA, NJCFA, or RICO would deprive this Court of diversity

jurisdiction. *See id.* at 583. Thus, this Court could exercise diversity jurisdiction over Plaintiff's claims as well.

Furthermore, this Court has personal jurisdiction over Defendants. Eminence is a New Jersey limited liability company with its principal place of business in New Jersey, and its sole member is allegedly DiMatteo. DiMatteo is a citizen of New Jersey. FS and Exclusive are Florida corporations with their principal place of business in Florida. Having represented Eminence and DiMatteo as the authorized dealer of FS/Exclusive, they have sufficient contacts with New Jersey. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). As FS and Exclusive present no such considerations, the presumption of personal jurisdiction over them stands. Finally, Saad is a resident of Florida and the owner of the FS and Exclusive. Personal jurisdiction over Saad depends on whether Saad himself, and not the corporate entities of FS and Exclusive, can be recognized as establishing contacts with the forum state. Plaintiff alleges that Saad failed to conduct due diligence on Eminence and DiMatteo and failed to notify Plaintiff that they were perpetrating a fraud on him despite personal knowledge to the contrary, for which Plaintiff contends he is vicariously liable. [Am. Compl. ¶¶ 97–102, 174–178.] He also alleges that he communicated directly with Plaintiff in August 2022 to deny responsibility. The Court finds that Saad has sufficient contacts with New Jersey for this Court to exercise personal jurisdiction over him.

**B.      Fitness of Defendants to be Subject to Default Judgment**

Second, the Court briefly notes that none of the Defendants appears to be an infant or incompetent person or a person in military service, which could exempt a defendant from default judgment in appropriate circumstances. *See* Fed. R. Civ. P. 55(b)(2); *see also* 50 U.S.C. § 3931. Accordingly, Defendants are subject to default judgment under Rule 55(b)(2). *See Liuna*, 2013 WL 4517935, at *3.

**C.      Proof of Service**

Third, the Court considers whether Defendants were properly served with process in this action. *See Thurston F. Rhodes, Inc.*, 2017 WL 3420912, at *2. In *Thurston*, the defendant was served with the motion for default judgment, as well as the summons and complaint. *Id.* Under these circumstances the *Thurston* court found sufficient proof of service. *Id.* Here, Plaintiff served Defendants with the Complaint and the Amended Complaint. [See Affs. of Serv., Docket No. 3; Am. Compl. 48.] When Defendants failed to respond to the Complaint, Plaintiff properly sought entry of default pursuant to Rule 55(a), providing service on October 19, 2022. [Docket No. 9.] Plaintiff served Defendants with the instant Motion for Default Judgment on October 26, 2022.  [Decl. of Mark H. Tidman 3, Docket No. 14.]  Accordingly, the court finds that there has been sufficient proof of service upon Defendants.

**D.      Causes of Action**

Fourth, the Court must determine whether Plaintiff's Amended Complaint states a proper cause of action against Defendants. *See Liuna*, 2013 WL 4517935, at

*3. The Court accepts as true Plaintiff's well-pleaded factual allegations but disregards its legal conclusions. *See id.* In his Amended Complaint, Plaintiff asserts a range of claims. They include fraudulent inducement, fraudulent misrepresentation, violation of the NJCFA, violation of the NJUTPA, violation of RICO, negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. [*See generally* Am. Compl.] Plaintiff also contends that FS, Exclusive, and Saad are vicariously liable for the fraud of Eminence and DiMatteo and that the Court should pierce the corporate veil, to the extent necessary, to hold DiMatteo responsible for Eminence's activities. [*Id.* ¶¶ 149–156, 168–172.] The Court first discusses Plaintiff's state and federal fraud claims before turning to Plaintiff's negligence, contract, and equitable claims. Ultimately, the Court concludes that Plaintiff has set forth plausible claims entitling him to the judgment of default that he seeks against Defendants.

1.   *Plaintiff's Fraud Claims under State and Federal Law.*

While Plaintiff alleges two common law and three statutory claims involving fraud, he relies on the same theory of injury in each case. Plaintiff alleges that: (a) Eminence and DiMatteo repeatedly made false representations to him about installing a pool at his Delaware summer home; (b) they knew or should have known that Plaintiff would rely on these misrepresentations to (i) enter into the initial contract and amended contract and (ii) remit multiple installment payments to DiMatteo following their agreement; (c) Plaintiff reasonably relied on these misrepresentations throughout the course of his relationship with Eminence and DiMatteo; and (d) Plaintiff suffered

11

actual damages, including $57,745 and other costs and fees in connection with this litigation. As a result, Plaintiff asserts that Eminence and DiMatteo are liable for fraudulent inducement, fraudulent misrepresentation, and violation of the NJUTPA and NJCFA. [Am. Compl. ¶¶ 130–142, 158–166.]

To establish a claim of fraudulent inducement, a plaintiff must prove the following: "(1) a material misrepresentation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (citing *Metex Mfg. Corp. v. Manson*, 2008 WL 877870, at *4 (D.N.J. Mar. 28, 2008)). To establish a claim of fraudulent misrepresentation, a plaintiff must prove virtually the same set of elements. *See Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997) (explaining that a plaintiff must prove: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."). The only way in which the elements of fraudulent inducement differ from those of fraudulent misrepresentation is with regard to reliance, which must be reasonable in the case of misrepresentation but need not be in the case of inducement. *See Columbus LTACH Mgmt., LLC v. Quantum LTACH Holdings*, LLC, 2018 WL 2455922, at *5 (D.N.J. May 31, 2018). Ordinarily, the economic loss doctrine bars a plaintiff from recovering in tort for damages resulting from the failure of a defendant to perform under a contract. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d

12

604, 618 (3d Cir. 1995) (explaining that New Jersey forbids recovery under a theory of fraud where a counterparty simply promises to perform a contract but ultimately fails to do so); *see also Manson,* 2008 WL 877870, at *4; *Unifoil Corp. v. Cheque Printers & Encoders Ltd.,* 622 F.Supp. 268, 271 (D.N.J. 1985). However, New Jersey courts permit a fraud claim to proceed alongside a breach of contract claim when the alleged fraud is related to pre-contractual misrepresentations or is "extrinsic to the performance of the contract," in other words, fraud in the inducement. *See D&D Assoc., Inc. v. Bd. of Educ. of N. Plainfield*, 2007 WL 4554208, at *27 (D.N.J. Dec. 21, 2007); *Payne v. Fujifilm U.S.A.*, 2007 WL 4591281, at *1 (D.N.J. Dec. 28, 2007).

Here, the Court finds that Plaintiff has plausibly alleged claims for fraudulent inducement and fraudulent misrepresentation. Though the extent of DiMatteo's fraud became clear *after* Plaintiff entered into the installation agreement with Eminence and DiMatteo, Plaintiff has alleged that, prior to doing so, Eminence and DiMatteo represented to him that they were "authorized dealers" of FS in New Jersey and Delaware and that Eminence was a legitimate enterprise. [Am. Compl. ¶¶ 28–33.] He has further alleged that Eminence, through Monaco and Lippi, offered to install a pool and certain accessories, but that Eminence never intended to perform under the contract. [*See, e.g., id.* ¶¶ 29–34, 83.] Thus, the Court can conclude for the purposes of resolving the instant Motion that the pre-contractual statements were misrepresentations on which Plaintiff relied to enter into an agreement with Eminence. [*Id.* ¶¶ 24–29.] Moreover, the Court can conclude from Plaintiff's allegations that he relied on DiMatteo's false promises of performance between October 2021 and the end

of summer 2022 in remitting various installment payments under their purported contract.  [*See id.* ¶¶ 35–88.]  While Plaintiff's reliance on these statements may have become increasingly unreasonable as the summer carried on, he has nonetheless set forth sufficient factual detail to state a plausible claim for fraudulent inducement and fraudulent misrepresentations for this Court to grant the present Motion.  Eminence's alleged post-contractual representations are fundamentally inconsistent with the proposition that Eminence every intended to perform under the installation agreement he induced Plaintiff to sign.

The economic loss doctrine is not to the contrary.  While the doctrine ordinarily precludes a plaintiff from recovering under a theory of fraud for a promisor's failed performance under a contract, *see Touristic Enters. Co. v. Trane Inc.*, 2009 WL 3818087, at *2 (D.N.J. Nov. 13, 2009) ("[F]raud claims intrinsic to the contract are generally barred by the economic loss doctrine[, which] . . . are based solely on the failure to perform."), the doctrine does *not* preclude claims that are "extrinsic to the contract," *id.* at *3.  The "dividing line between extrinsic and intrinsic fraud claims" is admittedly fuzzy.  *Id.*  But where, as here, a plaintiff sets forth specific assertions demonstrating that a purported contract was part and parcel of a party's fraud, the economic loss doctrine will not require the plaintiff to pursue recovery exclusively in contract.  *See id.* ("Fraud claims based on fraudulent inducement are not barred by the economic loss doctrine.") (citing *D&D Assocs.*, 2007 WL 4554208, at *27; *Payne*, 2007 WL 4591281, at *1); *see also Speedwell, LLC v. Town of Morristown*, 2023 WL 2207588, at *14–*15 (D.N.J. Feb. 24, 2023) (discussing the economic loss doctrine and its application in

this District).   Here, based on the well-pleaded allegations included in the Amended Complaint, the Court concludes that DiMatteo never intended to perform under the contract—his conduct is conceptually distinct from simple failure to perform for a legitimate, non-tortious reason.   Accordingly, Plaintiff has "alleged more than a breach of contract" and there is good reason to conclude that such claim would be insufficient to remedy Plaintiff's injury.  *See Trane Inc.*, 2009 WL 3818087, at *2.

Next, the Court addresses Plaintiff's statutory claims of fraud. Plaintiff asserts that Eminence and DiMatteo violated the New Jersey Consumer Fraud Act (NJCFA), the New Jersey Unfair Trade Practices Act (NJUTPA), and the Racketeer Influenced and Corrupt Organizations Act (RICO).   [Am. Compl. ¶¶ 104–117, 158–161, 163–166.] The NJCFA addresses "sharp practices and dealings . . . whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." *Smajlaj v. Campbell Soup Co.*, 782 F.Supp.2d 84, 97 (D.N.J. 2011) (quoting *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 271, 390 A.2d 566 (1978)). The statute specifically forbids the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J.S.A. § 56:8–2. This provision is referred to as the NJUTPA. *See generally Fish Kiss, LLC v. North Star Creations*, LLC, 2008 WL 3831335 (D.N.J. Aug. 13, 2018).

To state a claim under the NJCFA, a plaintiff must allege: (1) unlawful conduct by the defendant; (2) an ascertainable loss; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007). Unlawful conduct may take the form of affirmative acts, knowing omissions, and regulation violations. *Id.* Here, Plaintiff alleges several false representations and omissions of Defendants Eminence and DiMatteo that precipitated their contract and arose in connection with Eminence's purported performance under the contract.  In particular, Plaintiff cites a phone call in which DiMatteo and Monaco stated that they were the "authorized dealer and distributer for FS in New Jersey and Delaware," which Plaintiff alleges "cloaked [Eminence and DiMatteo] in an appearance of legitimacy as authorized agents of FS." [Am. Compl. ¶¶ 28–29.]  Plaintiff entered into the contract for sale four days after receiving a price quote following the phone statement.   Thereafter, it became increasingly clear to Plaintiff that DiMatteo had no intention of performing under the contract, as he failed to handle permitting for the project, missed deadlines, and never made any substantial progress on the project despite accepting wire payments from Plaintiff.  [*Id.* ¶¶ 32–84.] The Court finds that Plaintiff has set forth plausible claims under the NJCFA and NJUTPA, which should be construed liberally to accord appropriate relief to an injured consumer, as Plaintiff has alleged that he was injured as a result of being deceived by the misrepresentations of Eminence and DiMatteo in connection with their offer to install a pool for Plaintiff at his summer home.  *See Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (1994) (explaining that the NJCFA was

16

designed to protect the public and should be interpreted liberally in favor of consumers).

Finally, the Court address Plaintiff's RICO claim. Plaintiff alleges that Eminence and DiMatteo have violated RICO by participating in a pattern of racketeering activity characterized by multiple instances of interstate wire fraud. [Am. Compl. ¶¶ 104–117.] Plaintiff separately pleads conspiracy under 18 U.S.C. § 1962(d) and individual participation in the affairs of an enterprise through a pattern of racketeering activity under 18 U.S.C. § 1962(c). [*Id.*] Plaintiff alleges that DiMatteo and Monaco conspired, in violation of § 1962(d), to violate § 1962(c), and that Eminence and DiMatteo did violate it by using interstate wire communications such as transfers of funds (themselves fraudulent and in violation of 18 U.S.C. § 1343) in a "pattern" satisfying the definition in 18 U.S.C. 1961(d). This Court finds conspiracy under § 1962(d) and finds a pattern of wire fraud by Eminence and DiMatteo constituting the substantive offense in § 1962(c).

The Third Circuit explained in *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.* that "[t]he essence of the RICO offense is a defendant acting through or upon an *enterprise.*" 742 F.2d 786, 790 (3d Cir. 1984) (emphasis added). Mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d). *Id.* at 792 n.8. For the purposes of conspiracy liability under the Act, a plaintiff must allege an enterprise that is "separate and apart from the pattern of activity in which it engages." *Id.* at 790 n.5; *see also United States v. Riccobene,* 709 F.2d 214 (3d Cir. 1983). In *United States v. Riccobene*, the Third Circuit

explained that "the function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement." *Riccobene*, 709 F.2d at 224.

Here, Plaintiff identifies an enterprise in the form of Eminence, which DiMatteo and Monaco agreed to operate together. [Am. Compl. ¶¶ 3, 9–22, 28.] He alleges that DiMatteo and Monaco have operated Eminence and predecessor entities to perpetrate other frauds, too.  [*Id.* ¶¶ 9–22.] Further, Plaintiff alleges that DiMatteo and Monaco were engaged in "racketeering activity" through Eminence to commit several predicate acts of wire fraud. [*See id.* ¶¶ 35–80, 90–97.] Therefore, the Court finds that Plaintiff has properly pled conspiracy under § 1962(d).

Wire fraud under § 1343 requires a defendant's knowing and willful participation in a scheme to defraud, with the specific intent to defraud, and the use of interstate wire communications in furtherance of the scheme. *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012). A violation of § 1343 is one of the many predicates of "racketeering activity" under § 1961. A "pattern of racketeering activity" under § 1961 would require two violations of § 1343, and if this pattern were the means by which Eminence and DiMatteo participated in an enterprise, would expose Eminence and DiMatteo to liability under § 1962(c).

A "scheme to defraud" for purposes of mail and wire fraud need not contain misrepresentations on which the plaintiff relies. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 528 (3d Cir. 1998). "Omissions reasonably calculated to deceive persons of ordinary prudence and comprehension" support a finding of a

scheme even if the conduct is not "fraudulent on its face." *Id.* Here, Eminence and DiMatteo solicited multiple wire transfers from Plaintiff after contracting to install his pool. Plaintiff alleges that these transfers were not used for installation of the pool but rather personal benefit. [Am. Compl. ¶ 109.] Even if Eminence and DiMatteo did not misrepresent an intention to eventually install Plaintiff's pool, Defendants omitted that the wire transfers would not be directly applied to the installation of the pool. The court finds that Plaintiff sufficiently demonstrates that these omissions were "reasonably calculated to deceive" Plaintiff into additional transfers. *See Brokerage Concepts,* 140 F.3d at 528.

In order to demonstrate an "intent to defraud," a plaintiff must allege knowing action "with the intention to deceive or cheat." *United States v. Hoffecker*, 530 F.3d 137, 181 (3d Cir. 2008). "An intent to defraud is ordinarily accompanied by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." *United States v. Leahy,* 445 F.3d 634, 644 (3d Cir. 2006). Here, Plaintiff alleges that Eminence and DiMatteo brought about a gain to themselves and caused Plaintiff's losses via the wire transfers, and that they intended to deceive him into such transfers by knowingly omitting that the funds would not be directly applied to the installation of his pool. [Am. Compl. ¶¶ 106, 109.] Accordingly, Plaintiff has adequately plead an "intent to defraud."

Lastly, a plaintiff who has demonstrated a scheme to defraud and an intent to defraud must allege the use of interstate wire communications in furtherance of the scheme in order to demonstrate wire fraud in violation of § 1334. *Andrews*, 681 F.3d

518 (3d Cir. 2012). Here, Plaintiff alleges multiple such communications in the form of interstate wire transfers from himself, a citizen of Maryland, to Eminence and DiMatteo, citizens of New Jersey. [Docket No 5-4.] He alleges that Plaintiff routinely lied to him over the phone, via text, and through e-mail.  [*See* Am. Compl. ¶¶ 92–97.] Thus, Plaintiff has properly demonstrated wire fraud constituting a pattern of racketeering in violation of § 1962(c).

### 2.   *Vicarious Liability and Negligence*

Plaintiff also claims that Defendants FS, Exclusive, and Saad are vicariously liable for the fraud perpetrated by Eminence and DiMatteo. [Am. Compl. ¶¶ 168–72.] Plaintiff separately pleads that FS, Exclusive, and Saad were negligent in appointing Eminence and DiMatteo as authorized dealers of their swimming pool products. [*Id.* ¶¶ 174–78.] This Court finds that Plaintiff has set forth sufficient facts for Defendants FS, Exclusive, and Saad to be held vicariously liable for the fraud of Eminence and DiMatteo. The Court further finds that Plaintiff has stated a claim that FS, Exclusive, and Saad are liable for negligence.

First, the Court discusses Plaintiff's theory of vicarious liability.  Under New Jersey agency law, a principal is generally liable for the torts of a "servant" (or, more commonly, an employee) where the servant is acting within the scope of his employment, but the principal is not generally liable for the torts of an "independent contractor" if the principal did not direct or participate in the contractor's torts. *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1435 (3d Cir. 1994)

20

(citing *Baldasarre v. Butler*, 625 A.2d 458, 464–65 (N.J. 1993)). Where an independent contractor is acting as an agent of a principal, the principal may be held liable for the contractor's misrepresentations "upon matters which the principal might reasonable expect would be the subject of representations, provided the other [third] party has no notice that the representations are unauthorized." *Id.* at 1437 (citing *Sanders v. Rowan*, 484 A.2d 1023, 1029 (Md. 1984)). In other words, a principal cannot disclaim liability for its contractors where it places them in the marketplace, enables their deceit, and profits from their actions. *Id.* at 1438; *see also Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 83 (N.J. 1993) (observing that courts routinely consider "awareness of the risk and the elements of foreseeability of loss in their consideration of liability based on agency principles").

Here, Plaintiff has plausibly alleged that Eminence and DiMatteo were acting as independent contractors and agents of FS, Exclusive, and Saad, that they enabled Eminence and DiMatteo through the FS website to communicate and sell pools to "unsuspecting consumers," and that they profited from the misrepresentations of Eminence and DiMatteo, knowing full well of their deceit. Specifically, Plaintiff alleges that the FS website introduced consumers like him, through its "Request a Quote" feature, to Eminence and DiMatteo as an "authorized dealer" and "cloaked" them "in an appearance of legitimacy as authorized agents of FS." [Am. Compl. ¶¶ 26, 29.] He further alleges that FS, Exclusive, and Saad failed to exercise any due diligence of Eminence and DiMatteo, that they "rubber stamped" all "authorized dealer" applications, and that Saad had personal knowledge of Plaintiff's pool order

21

and DiMatteo's fraud (including past frauds). [*Id.* ¶¶, 26–29, 98–102, 168–72.] Accordingly, given the knowledge FS, Exclusive, and Saad are alleged to have possessed, their lack of care in light of such knowledge, and their profit from such willful blindness, this Court concludes that they may be held vicariously liable for the fraud of Eminence and DiMatteo. *See Am. Tel. & Tel. Co.*, 42 F.3d at 1438 (noting that it would be unjust to allow a principal "to place agents in the marketplace, to allow the agents to complete contracts on the principal's behalf, to profit from the agents' misrepresentations, and then to disclaim liability for the agents' actions while benefiting from the fraud"); *see also Nat'l Premium Budget Plan Corp. v. Nat'l Fire Ins. Co. of Hartford*, 234 A.2d 683, 709 (N.J. 1967) (observing that a principal who puts his agent in a position that enables the agent, while acting with apparent authority, to commit a fraud upon third persons is liable to such persons) (citing RESTATEMENT (SECOND) OF AGENCY §§ 261, 262 (1958)).  Plaintiff has met his burden as to vicarious liability for the purposes of the present Motion.

Additionally, the Court finds that Plaintiff has stated a plausible cause of action for negligence against FS, Exclusive, and Saad.  To hold a defendant liable for negligence, a plaintiff must plead four elements: (1) that defendant owed a duty of care to plaintiff, (2) that defendant breached that duty, (3) that such breach was the proximate cause of plaintiff's injury, and (4) that defendant suffered damages. *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015).  Just as an employer will be held liable through the tort of negligent hiring or retention for an employee's injury to a third party (even though the injury was brought about by the willful act of the employee

22

beyond the scope of his employment), *Di Cosala v. Kay*, 450 A.2d 508, 516 (N.J. 1982), a principal can be held liable through the tort of negligent supervision for an independent-contractor-agent's tortious conduct, *cf. Belmon v. MB Inv. Partners, Inc.*, 708 F.3d 470, 488 (3d Cir. 2013) (setting forth and discussing elements of negligent supervision claim against employer for employee's harm to third party); *see* RESTATEMENT (SECOND) OF AGENCY § 213, cmt. d ("principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him."). Accordingly, a principal can be independently liable for the injurious conduct of an agent towards a third party where the principal owes a duty of care to the third party, is on notice of the agent's wrongful conduct, and fails to act. *See Sylvan Learning Sys., Inc. v. Gordon*, 135 F.Supp.2d 529, 548 (D.N.J. 2000) (finding that an insurer was *not* liable in negligence for failing to supervise an insurance broker who overcharged an insured because insured failed to explain how "red flags" would have put insurer on notice of broker's wrongful actions).

Here, Plaintiff has set forth a plausible claim for the purposes of the present Motion. He alleges that FS, Exclusive, and Saad owed Plaintiff, a customer, a duty of care—to refer only legitimate agents to customers in the conduct of their pool sales business and "authorized dealer" program. [Am. Compl. ¶ 174.] He further alleges that they breached that duty of reasonable care by representing that Eminence was an "authorized dealer" and, thus, a legitimate business while having conducted no due diligence on Eminence, DiMatteo, or Monaco; they are also alleged to have breached

their duty by willfully ignoring their history of fraudulent behavior, of which Plaintiff alleges Saad was on notice. [*Id.* ¶¶ 175, 176.] Plaintiff asserts that such breach by FS, Exclusive, and Saad proximately caused him to suffer at least $57,745 in damages. [*Id.* ¶¶ 177, 178.] The Court concludes that Plaintiff's allegations set forth a plausible claim that FS, Exclusive, and Saad are a proximate cause of his damages—had they exercised reasonable care, Plaintiff would not have been defrauded.

### 3. *Piercing the Corporate Veil*

Next, the Court considers Plaintiff's assertion that Defendant DiMatteo has engaged in conduct permitting this Court to disregard the corporate form of Eminence and "pierce the corporate veil." [Am. Compl. ¶¶ 149–56.] In New Jersey, that remedy applies to the limited liability company as well as other corporate forms. *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F.Supp.2d 668, 679 n.5 (D.N.J. 2009). However, "in the absence of extraordinary circumstances, such as fraud or injustice, a court will generally decline to pierce the corporate veil." *State Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983).

A plaintiff must present two elements for a court to pierce the corporate veil: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *The Mall at IV Grp. Properties v. Roberts*, 2005 WL 3338369, at *3 (D.N.J. Dec. 8, 2005) (citation omitted)). In *Craig*

24

*v. Lake Asbestos of Quebec, Ltd.,* the Third Circuit provided six non-exclusive factors for a court to determine whether a corporate form exhibits unity of interest and ownership:

> [1] gross undercapitalization . . . [2] failure to observe corporate formalities, non-payment of dividends, [3] the insolvency of the debtor corporation at the time, [4] siphoning of funds of the corporation by the dominant stockholder, [5] non-functioning of other officers or directors, absence of corporate records, and [6] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

843 F.2d 145, 150 (3d Cir.1988) (internal quotations omitted). A plaintiff need not prove common law fraud to prove that adherence to the corporate fiction would sanction a fraud or promote an injustice. Rather the plaintiff need only comply with the "less exacting standard" of proving "a fraud, injustice, or the like." *Roberts*, 2005 WL 3338369, at *3.

Here, Plaintiff alleges multiple of the *Craig* factors for unity of interest and ownership. Plaintiff alleges that Eminence is "grossly undercapitalized" [Am. Compl. ¶ 152], that DiMatteo did not adhere to corporate formalities such as executing a written agreement to establish Eminence as an LLC [*id.* ¶ 151], that DiMatteo distributed Eminence's cash assets to himself [*id.* ¶ 152], and that DiMatteo considered the agreement with Plaintiff to be one in which DiMatteo himself was a party as the personal agent of FS [*id.* ¶ 150]. Additionally, this Court finds that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice against Plaintiff. Plaintiff successfully pleads wire fraud under RICO, which satisfies the "less exacting standard" set for a plaintiff attempting to demonstrate "a fraud,

injustice, or the like." Thus, plaintiff successfully pleads facts warranting that this Court pierce the corporate veil.

    **4.**    ***Breach of Contract, Breach of the Implied Covenant, and Unjust Enrichment***

Finally, the Court considers Plaintiff's contract claims. Plaintiff alleges that Eminence and DiMatteo breached their pool installation contract. [Am. Compl. ¶¶ 119–23.] Plaintiff also sets forth a claim for breach of the implied covenant of good faith and fair dealing and, in the alternative, a claim for unjust enrichment. [*Id.* ¶¶ 125–28, 144–47.] Although the contracting party was Eminence and not DiMatteo, this Court has found reason to disregard the corporate form of Eminence and hold DiMatteo responsible. *See supra* Part III.D.3. As pled, any liability for these various contract claims would attach to DiMatteo, too. The Court finds that Plaintiff has sufficiently set forth claims that Eminence and DiMatteo failed to perform under the installation contract and breached the implied covenant of good faith and fair dealing and that, in the alternative, they are liable for unjust enrichment.

To state a claim for breach of contract, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). The contract dated October 12, 2021 and amended October 13, 2021 for the "sale and installation of a fiberglass swimming pool" [Docket No. 5-2, at 4] satisfies the first element of the cause of action. Plaintiff's payment of the original contract

price, payment each time Eminence and DiMatteo indicated that performance of the new contract required additional installments, and compliance with various terms such as applying for a building permit and being present for the installation [Docket No. 5-2, at 3] satisfy the fourth element. The fact that Plaintiff does not allege damages in the value of the new contract price only reflects his decision not to pay the installment associated with completion. [Am. Compl. ¶ 34; Docket No. 5-2, at 2.] However, in order for the second and third elements to be satisfied, Plaintiff must demonstrate that Eminence and DiMatteo did not perform in accordance with the contract. This raises the secondary question of whether Eminence's digging of the hole makes any breach a partial breach for purposes of calculating damages.

The contract specifies that the "approximate" completion date is "1 to 2 days from start" and that the "approximate" starting date is "ASAP," after the signing of the contract. However, the contract clarifies that the completion date is "within 30 days of the actual starting date," which in turn must be "within 30 days of permit approval." [Docket No. 5-2, at 2.] Even allowing for the maximum installation window of sixty days, running from permit approval in March 2022 [Am. Compl. ¶ 37], Eminence and DiMatteo have failed to install the pool in time to comply with the contract. Thus, the second element of the breach of contract is satisfied. Finally, Plaintiff has sufficiently alleged that his damages flowed from the failure of Eminence and DiMatteo to install the pool within the period permitted by the contract; he claims that "[a]s a direct and proximate result of [E]minence's breach, Plaintiff has suffered,

27

and continues to suffer, substantial damages." [*Id.* ¶ 123.] *See Video Pipline, Inc. v. Buena Vista Home Enter., Inc.*, 210 F.Supp.2d 552, 561 (D.N.J. 2002).

Next, Plaintiff claims that Eminence and DiMatteo breached the implied covenant of good faith and fair dealing and were unjustly enriched through their fraudulent conduct. Under New Jersey law, the implied covenant of good faith and fair dealing attaches to all contracts. *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420, 690 A.2d 575 (1997). The implied covenant mandates that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Seidenberg v. Summit Bank*, 348 N.J. Super 243, 254, 791 A.2d 1068 (App. Div. 2002). A plaintiff cannot premise a claim of breach of the implied covenant on a failure to perform an express term of the contract. *Wade v. Kessler Inst.*, 343 N.J. Super. 338, 778 A.2d 580 (App. Div. 2001), *aff'd as modified*, 172 N.J. 327, 798 A.2d 1251 (2002). Still, a breach of the implied covenant can be premised on a party's bad faith performance of the agreement. *Kumon N. Am., Inc. v. Timban*, 2014 WL 2812122, at *7–*8 (D.N.J. June 23, 2014). At the pleading stage, a plaintiff need not only set forth an allegation of bad faith. *Seidenberg*, 348 N.J. Super at 257, 791 A.2d 1068.

Here, Plaintiff has met his burden of alleging that Eminence and DiMatteo breached an implied obligation to deal "honestly and in good faith" with Plaintiff, as Plaintiff alleges their bad faith intention not to perform under the agreement. Plaintiff premises his claim on their "wrongful and fraudulent conduct," [Am. Compl. ¶ 128],

which differs from their breach of contract claim in that Plaintiff alleges that they *never* intended to perform, rather than failed to complete the installation on time. Thus, Plaintiff has sufficiently pled a claim for breach of the implied covenant of good faith and fair dealing.

Finally, to establish a claim for unjust enrichment under New Jersey law, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust and that the plaintiff expected remuneration and the failure to give remuneration unjustly enriched the defendant." *EnviroFinance Grp., LLC v. Envtl. Barrier Co.*, 112 A.3d 775, 790 (N.J. Super. Ct. App. Div. 2015) (internal quotation marks and citation omitted). Here, Plaintiff has alleged that he paid Emnience, DiMatteo, and Monaco $52,745 under their contract; that they retained his payments; and that the circumstances make it inequitable for them to retain such funds. [Am. Compl. ¶¶ 144–47.] Plaintiff has clearly alleged sufficient details to meet the elements of unjust enrichment as an alternative theory of remuneration. *See Dzielak v. Whirlpool Corp.*, 26 F.Supp.3d 304, 331 (D.N.J. 2014) (explaining that unjust enrichment is a "backstop cause of action that often turns out to be superfluous if, for example, a breach of contract is shown" but that a plaintiff may plead it in the alternative).

### E.    Propriety of Default Judgement

Fifth, the Court must assess whether default judgment is appropriate. This assessment requires the Court to consider the prejudice to Plaintiff if the Motion

for Default Judgment is not granted. *Butler*, 613 F. App'x at 122 (citing *Chamberlain*, 210 F.3d at 164). By failing to respond to Plaintiff's Amended Complaint or oppose the Motion for Default Judgment, Defendants have deprived Plaintiff of the opportunity to litigate his claims. Therefore, the court finds that Plaintiff would be prejudiced if the Motion for Default Judgment were not granted.

The assessment of whether default judgement is proper also requires the Court to consider whether Defendant's have a litigable defense and whether Defendants' delay is the result of culpable misconduct. *Id.* Defendants have failed to oppose the Motion for Default Judgment, so this Court is "not in a position to determine whether [Defendants] ha[ve] any meritorious defense or whether any delay is the result of culpable misconduct." *Teamsters Health & Welfare Fund of Phila. & Vicinity v. Rock Canyon, Inc.*, 2015 WL 881694, at *2. (D.N.J. Mar. 2, 2015) (citation omitted). Further, "[t]he court has no duty to construct a defense for Defendant[s]." *New Jersey Bldg. Laborers' Statewide Pension Fund & Trs. Thereof v. Pulaski Constr.*, 2014 WL 793563, at *3 (D.N.J. Feb. 26, 2014).

Moreover, Defendants' "failure to respond permits the court to draw an inference of culpability on [their] part." *Fed. Ins. Co. v. Secure Cargo Corp.*, 2013 WL 1222653, at *3 (D.N.J. Mar. 25, 2013) (citing *Surdi v. Prudential Ins. Co. of Am.*, 2008 WL 4280081, at *2 (D.N.J. Sept. 8, 2008)). Defendants were served with the Complaint and the instant Motion, [*see* Docket Nos. 2, 3, 5, & 9-2], yet they have not responded to either, [*see generally* Docket]. The Court finds Defendants' failure to

respond to be indicative of their culpability. *See Moroccanoil, Inc. v. JMG Freight Grp. LLC*, 2015 WL 6673839, at *2 (D.N.J. Oct. 30, 2015) (citing *Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 523 (3d Cir. 2006). Thus, all five Chamberlain factors favor entry of default judgment against Defendants.

### F.    Damages

Finally, the Court considers Plaintiff's request for damages. The Court must accept Plaintiff's well-pleaded factual allegations as true but need not accept Plaintiff's factual allegations regarding damages as true. *See Chanel, Inc. v. Gordashevsky*, 558 F.Supp.2d 532, 536 (D.N.J. 2008). Sworn affidavits and documentary evidence can sufficiently support Plaintiffs' damages claim. *See IBEW Local 351 Pension Fund v. George Sparks, Inc.*, 2015 WL 778795, at *2 (D.N.J. Feb. 24, 2015). But, if the damages are for a "sum certain" or "for a sum which can by computation be made certain," further evidentiary inquiry is not necessary. *Id.* (citation omitted).

Here, Plaintiff requests that this Court order Defendants to pay $173,235.00, which represents the amount paid to Eminence and DiMatteo, trebled. Plaintiff describes a history of wire transfers totaling $48,745 and a check for $4000 paid to DiMatteo for concrete, [*see* Docket No. 5-4], and he describes paying a third-party contractor $5000 to pour concrete because DiMatteo failed to do so. [Am. Compl. ¶¶ 61, 63, & 64.] The total expended sum then is $57,745.00, which trebled under RICO is $173,235. Thus, Plaintiff's requested sum is supported by submissions of the detail necessary for this Court to ascertain the basis for the computation of that sum.

## IV.    CONCLUSION

For the foregoing reasons, the Motion for Default Judgement will be **GRANTED**. An accompanying Order shall issue on today's date.


<u>**May 3, 2023**</u>                                   <u>**s/Renée Marie Bumb**</u>
Date                                                    RENÉE MARIE BUMB
                                                        Chief United States District Judge